IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ASKM, LLC, et al.,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>THOMAS R. FRY, et al.,<br><br>　　　　　Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:08-CV-786-TC-DN |

Plaintiffs ASKM, LLC, Shannon Tinoisamoa, and Apisa Tinoisamoa have moved for a prejudgment writ of attachment to seize various assets of the Defendants. Because the Plaintiffs have met all the requirements for a prejudgment writ of attachment under Utah law, the court **GRANTS** the motion.

## BACKGROUND

Defendants Working Capital, LLC, Brick and Mortar Investments, LLC (BMI), BTN Tracker, LLC (BTN), and Clear Communications, LLC, are Utah limited liability companies whose registered agent is Defendant Thomas Fry and whose sole members are Mr. Fry and Defendant Amy Fry, Mr. Fry's spouse.

In January of 2007, Plaintiffs loaned $2,000,000 to Working Capital. This was followed by a $1,000,000 loan in June of 2007. The loans were made pursuant to a promissory note in which Working Capital agreed to pay a monthly rate of return of three percent. Working Capital also issued a private offering memorandum and subscription agreement to Plaintiffs. The promissory note refers

to Section 7.4 of the offering memorandum in the event of a default. Section 7.4 reads "If current cash flow of the Company is inadequate to return a Noteholder's principal when due, the Company is not required to liquidate any Company loans prior to maturity for the purpose of making a return of principal payment, and is merely required to continue paying whatever cash flow is available to Noteholders until their payment of principal is complete." (Def.'s Mem. in Opp'n, Ex. 1 at 7.4.)

Shortly after receipt of the $3,000,000, Working Capital transferred $1,250,000 to BMI and $1,750,000 to BNT. BMI purchased $1,250,000 in stock from Tigerlight, Inc., which was put into Mr. Fry's name. BNT transferred $1,750,000 to Defendant Jeffrey Mowen.[1] Working Capital, BMI, and BNT were all controlled by Mr. Fry.

Mr. Fry did not observe any formalities in transferring money between these entities, did not document the loans, and relied solely on the entities's bank statements to track funds. Mr. Fry testified that shortly after BMI received the $1,250,000 from Working Capital, BNT assumed BMI's obligation to repay Working Capital. There was no documentation of this assumption and BNT did not receive any consideration for assuming this obligation. The only evidence that this assumption occurred is the fact that BNT provided funds to Working Capital so that Working Capital could make the interest payments to Plaintiffs on the promissory note.

Although Plaintiffs received the promised returns for over a year, beginning in May of 2008, the payments ceased. (Plaintiffs received payments totaling about $1.1 million). Mr. Fry testified

---

[1]There is some dispute about whether the money invested by Plaintiffs can be tracked with accuracy because of a lack of corporate records, reasonable documentation, and commingling of funds. For the purposes of this motion, the court will assume that the money loaned by Plaintiffs moved through BMI and BNT as Mr. Fry claims. But there was extensive commingling of funds and no documentation of transfers and loans, making accurate tracking of funds that moved between the Fry-controlled entities extremely problematic.

that he could no longer pay Plaintiffs because Mr. Mowen had stopped paying him. Mr. Mowen has subsequently been indicted for, among other things, running a Ponzi scheme. Plaintiffs allege that Mr. Fry was aware of Mr. Mowen's fraud and a participant in it, but these allegations have not been established at this time.

BMI had other sources of funds, including approximately $2 million that was invested in another venture, Taurus Drilling, LLC. That investment in Taurus Drilling generates returns of $26,000 per month. Bank records demonstrate that, after Taurus Drilling makes its monthly payment to BMI, Mr. Fry withdraws the funds from BMI and deposits them into his private account. He then uses the money for his own benefit.

BTN also had access to other funds. Mr. Fry set up a trust account with his attorneys at Ascione, Heideman & McKay, LLC at American Bank of Commerce in Provo (TRF Trust Account). In June of 2007, Mr. Fry transferred over $8,000,000 from BTN into the TRF Trust Account. Funds from BTN were also transferred to Clear Communications. Mr. Fry has testified that Clear Communications is making payments for his and his family's personal expenses. He has also admitted that he had no accounting system or tracking system to manage loans between BTN and Clear Communications. Mr. Fry stated that BTN and Clear Communications are "both my businesses and so I've never looked at it as one owing the other anything." (Plt.'s Mem. in Supp., Ex. H at 285:7-9.) In addition, nearly $9,000,000 was transferred from the TRF Trust Account to Mr. Fry or Clear Communications after the trust account received the funds from BTN. At this time there is no clear accounting of where these funds originated or their current location.

## ANALYSIS

Federal Rule of Civil Procedure 64(a) reads: "[a]t the commencement of and throughout an

action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Accordingly, this court must apply Utah's rules for prejudgment seizure of property. The Utah Rules of Civil Procedure allow a "writ of replevin, attachment or garnishment" before judgment upon written order of the court. Utah R. Civ. P. 64A(a). A plaintiff seeking a writ must show:

> (1) that the property is not earnings and not exempt from execution; and (2) that the writ is not sought to hinder, delay or defraud a creditor of the defendant; and (3) a substantial likelihood that the plaintiff will prevail on the merits of the underlying claim;

Utah R. Civ. P. 64A(c). In addition, a plaintiff must demonstrate one of the following:

> (4) that the defendant is avoiding service of process; or (5) that the defendant has assigned, disposed of or concealed, or is about to assign, dispose of or conceal, the property with intent to defraud creditors; or (6) that the defendant has left or is about to leave the state with intent to defraud creditors; or (7) that the defendant has fraudulently incurred the obligation that is the subject of the action; or (8) that the property will materially decline in value; or (9) that the plaintiff has an ownership or special interest in the property; or (10) probable cause of losing the remedy unless the court issues the writ.

Id. The Plaintiffs here contend that they have met all the requirements of subsections (1)-(3) and have satisfied subsection (10). The court considers each of these requirements in turn.

### A. Property is not earnings and not exempt

Plaintiffs must show "that the property is not earnings and not exempt from execution." Utah R. Civ. P. 64A(c)(1). The Utah Rules of Civil Procedure define "earnings" as "compensation, however denominated, paid or payable to an individual for personal services." Utah R. Civ. P. 64(a)(5). The property Plaintiffs seek to attach are returns on investments paid to a corporate entity. There is no evidence they are compensation for personal services. Accordingly, the property is not exempt, and Plaintiffs have satisfied this requirement.

B. <u>Writ not sought to hinder, delay or defraud a creditor of Defendants</u>

Next, Plaintiffs must show "that the writ is not sought to hinder, delay or defraud a creditor of the defendant." Utah R. Civ. P. 64A(c)(2). It is very likely that Plaintiffs in this case are not the only creditors of Working Capital, BTN, and BMI. See <u>SEC v. Mowen, et al.</u>, No. 2:09-CV-786-DB (D. Utah filed Sept. 2, 2009). For example, the origin of the approximately $2 million that BMI invested in Taurus Drilling is unknown. But there is no evidence to suggest that the writ is sought to hinder, delay or defraud those creditors. Plaintiffs have shown that the funds paid to BMI are being used only for Mr. Fry's personal use. The use of the funds in Clear Communications and the Trust Account is less clear, but there is no evidence to suggest they are being used to pay creditors. The court recognizes that, even in the event Plaintiffs prevail in this lawsuit, other creditors may have claims on these attached funds. Such disputes may be addressed at a future date and do not prevent Plaintiffs from meeting their burden as to this prong.

C. <u>Likelihood of success on the merits</u>

Plaintiffs argue that there is a substantial likelihood that they will prevail on their claim for breach of the promissory note. But to demonstrate that they are entitled for a prejudgment writ of attachment, they must also show that there is a substantial likelihood that they are entitled to funds held by BMI, BNT and Clear Communications, even though these entities were not parties to the promissory note. Plaintiffs contend that BMI, BNT, Working Capital and Clear Communications are alter egos of Mr. Fry and, for that reason, there is a substantial likelihood they will prevail in their attempt to pierce the corporate veil.

**1. Breach of the promissory note**

To show that the promissory note (a contract) has been breached, Plaintiffs must prove (1)

that a contract existed, (2) there has been performance by the party seeking recovery, (3) there has been a breach of contract by the other party, and (4) they have incurred damages. Bair v. Axiom Design, L.L.C., 20 P.3d 388, 392 (2001). It is undisputed that a contract existed between Plaintiffs and Working Capital in the form of the promissory note. It is also undisputed that Plaintiffs performed by loaning Working Capital $3,000,000 and that Working Capital has breached by failing to make the promised payments. Defendants argue that because Plaintiffs were informed that their investment was high risk, Working Capital did not breach the promissory note when it failed to make payments. This argument is not persuasive. In the promissory note, Working Capital agreed to make certain payments and failure to do so constitutes breach. The court is convinced that Plaintiffs have shown a substantial likelihood that they will prevail on this claim.

### 2. Piercing the corporate veil

To attach property in possession of BTN, BMI, and Clear Communications, Plaintiffs must show there is a substantial likelihood that they can pierce the corporate veil and show that the Fry-controlled entities are alter egos of Mr. Fry. This requires Plaintiffs to establish:

> (1) Such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, but the corporation is, instead, the alter ego of one or a few individuals; and (2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an inequity.

Colman v. Colman, 743 P.2d 782, 786 (Utah Ct. App. 1987) (citing Norman v. Murray First Thrift & Loan Co., 596 P.2d 1028, 1030 (Utah 1979)). As the Utah courts have explained,

> Certain factors which are deemed significant, although not conclusive, in determining whether this test has been met include: (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for operations of the dominant stockholder or

stockholders; and (8) the use of the corporate entity in promoting injustice or fraud. Id. at 786 (citations and footnotes omitted).  The court explained that "[f]ailure to observe corporate formalities includes such activities as commencement of business without the issuance of shares, lack of shareholders' or directors' meetings, lack of signing of consents, and the making of decisions by shareholders as if they were partners." Id. at 786 n.2.  Importantly, the court emphasized that "[f]ailure to distinguish between corporate and personal property, the use of corporate funds to pay personal expenses without proper accounting, and failure to maintain complete corporate and financial records <u>are looked upon with extreme disfavor</u>." Id. at 786 n.3 (emphasis added).

  Defendants argue that records of loans were kept in the form of bank statements and, in any event, Mr. Fry kept detailed Excel spreadsheets which were sent to all of his lenders each month tracking their investments.  But Mr. Fry's deposition testimony makes clear that he did not observe corporate formalities.  For example, his various entities assumed obligations for each other without consideration, millions of dollars were transferred or loaned without documentation, and Mr. Fry controlled every aspect of these transactions without any oversight or accountability.  Defendants have not pointed to any meaningful corporate records.  To the contrary, Mr. Fry testified that he felt no need to track funds transferred between Clear Communications and BNT because they were both his companies.  Furthermore, Working Capital was severely undercapitalized with no assets other than payments made to it by BNT (payments which were not governed by any contractual obligation).  Importantly, at this time Mr. Fry takes all the earnings of BMI and deposits them for his own personal use, failing to distinguish between personal and corporate property.  Plaintiffs have also produced evidence suggesting this siphoning of funds for personal use occurred at other times. The Utah courts very clearly disfavor this type of activity and consider it an important consideration

in the veil piercing analysis. Colman, 734 P.2d at 786 n.3. Finally, the evidence suggests that Mr. Fry is using the corporate form to promote an injustice—namely the use of funds to enrich himself rather than repay the corporations' creditors. Accordingly, the court concludes there is a substantial likelihood that Plaintiffs will succeed in piercing the corporate veil.

### D. Probable cause of losing the remedy

Finally, the Plaintiffs must show that unless the court grants their motion, there is probable cause that they will lose their remedy if they prevail on the claims. The evidence leaves no doubt that Mr. Fry is taking all funds from the Fry-controlled entities. Absent the issuance of the writ, there is probable cause to believe this practice will continue and there will be no funds available to pay a judgment.

## ORDER

For the foregoing reasons, the court orders the issuance of a **prejudgment writ of attachment** for:

(1) any remaining cash held by Working Capital, LLC, Brick & Mortar Investments, LLC, and BTN Tracker LLC;

(2) Tigerlight, Inc. stock purchased by Brick & Mortar Investments, LLC;

(3) any cash Brick & Mortar Investments, LLC has received or will receive, and all accounts receivable and all other monies due or to become due from Taurus Drilling LLC;

(4) any cash transferred from Brick & Mortar Investments, LLC or BTN Tracker LLC to Clear Communications LLC; and

(5) any cash transferred from the TRF Trust Account held by Ascione, Heideman & McKay,

LLC at American Bank of Commerce in Provo to Defendant Thomas R. Fry or Clear Communications LLC.

Any attached funds must be deposited with the Clerk of the Court to be held pending the resolution of this lawsuit.

DATED this 1st day of December, 2009.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge